So we have Mr. McCardle for Rise and Shine. You reserve three minutes for rebuttal, and you can begin whenever you're ready. Yes, Your Honor. And may it please the Court, Chris McCardle for Appellant Rise Brewing. Before I dive into the legal issues, I think it's important to very briefly recap how we got here. Over the past decade, Rise Brewing has gone from just an idea into an award-winning brand, including winning People Magazine's award for best canned coffee. Pepsi executives met with Rise five times and specifically discussed acquiring Rise, but Pepsi instead decided to launch its own caffeinated morning energy drink using the name Rise. Actual confusion ensued. In our 56.1 statement at the District Court, we listed 19 instances of actual confusion. Turning to the legal issues, the District Court erred by awarding Pepsi summary judgment of no trademark infringement. Of the eight Polaroid factors, the District Court found that four favored Rise Brewing, two were neutral or didn't apply, and only two favored Pepsi. Despite only two of the factors favoring Pepsi, the District Court awarded Pepsi summary judgment. Why? The answer is that the District Court misinterpreted this Court's opinion vacating the preliminary injunction. When this Court vacated the preliminary injunction, it didn't rule on the merits. It didn't establish as a matter of law that Rise Brewing can't win this case. The Court simply ruled that a preliminary injunction wasn't warranted. Well, the District Court didn't say that our Court decided as a matter of law that Rise Brewing can't win the case, right? But our Court did decide that the mark is inherently weak, and that is about the inherent strength of the mark. And then it just said there weren't additional facts that could overcome that determination, right? The District Court was very clear on its determination of inherent distinctiveness, so one of the two parts of strength of mark. It said plaintiff's mark is inherently weak as a matter of law per the Second Circuit's binding conclusion. That's true. That's what the first panel said. The first panel said it was a legal error because it was inherently weak, but you could still have put on, you could have submitted evidence on acquired. So to be very clear about what the prior panel actually said, and I'm looking at, this is A554 and A555, which is the panel's decision. It's in the appendix, but it's page 13 and 14. They said while at times the classification of the mark has been considered a factual matter, they've also stated that there's an undeniable legal component. But just because there's a legal component doesn't mean that it's totally a question of law. No, the factual component is whether or not it had some type of secondary meaning. That's the factual component of the strength of the mark factor. I think the court was talking about, so it's citing for the factual component, it's citing the Bristol-Myers case. There's some factual component, right? Like you decide whether something is suggested. It depends on understanding this product and the nature of things as opposed to whether using the word rise describes the product or kind of is metaphorically connected to it. So that's kind of factual, I guess, although it's facts about the world. But ultimately it's a legal standard. And so our court determined that the district court was right to say it's suggestive because rise is kind of metaphorical. But then it said it's very weakly – the strength is inherently weak because rise is a very common metaphor for getting up early in the day and drinking a cup of coffee and so on, right? So you're right that there is a factual component. So there's a factual component of either the application of a legal standard. And look, maybe at worst it's a – So even if we think that the facts could change, what are the different facts here? We do. We have new facts in the record. You say one thing is that there's dictionaries that don't say that the word coffee appears in a definition of rise, right? Correct, correct. But so what? I mean that's why it's suggestive, right? Like nobody thinks that rise just describes coffee directly. It's suggestive, not descriptive. And then the other thing you say is that there's evidence that the word rise is associated with the morning and getting up and going, right? Yes. Is that really your argument? Well, our argument is that as a question of fact on summary judgment. I just don't – like, you know, okay, so rise is about getting up in the morning. Like that's pretty obvious. But like isn't that also something we discussed in that initial opinion? That's the whole reason we say that it's weak because the word rise is associated with getting up in the morning and having a perk from coffee and so on. And that's what makes it weak because that's a pretty common way of talking about having a morning cup of coffee. To be very clear, the earlier opinion said that there were factual connections, like a connection between the word rise and coffee. Now the record is different now. We have all of these new facts about what does rise mean. And rise – there's no fact in the record now that says that rise means anything about coffee. It says that rise is associated with feelings of energy and getting up in the morning but not coffee. But even setting the inherent distinctiveness aside. So if I understood the preliminary injunction decision from our court to depend on the notion that rise is descriptive of coffee, you're saying you could reach a different conclusion based on the idea that rise is actually not descriptive of coffee but really just describes getting up in the morning and having energy. Now if I understood, which I think just a normal reading of the opinion communicates this, that that is what the original opinion was based on. That rise is about getting up in the morning and having increased energy. Then there would be no change of actual basis, right? So I don't think that that's how the opinion should be read. But sure, if you say in the opinion it's not directly linked to coffee, then I still think we have new facts in the record that weren't on a PI record. So I think that that's something that needs to be considered here. Well, the district court doesn't say there are new facts in the record, right? The district court just says – The district court didn't consider those facts. The district court – no, no. For inherent distinctiveness, the district court said my hands are tied. But even setting aside inherent distinctiveness – All right, let's say maybe I agree with that or not. But we could affirm based on anything in the record. So we should still affirm even if that was somehow a mistake, but the record isn't materially different, right? So the question of strength of mark doesn't turn solely on inherent distinctiveness. There's also this acquired distinctiveness. There's a lot of new facts in the record about acquired distinctiveness. The district court did look at your evidence and said no rational jury could conclude that this had a secondary meaning. So why was that incorrect? So the district court did not consider all of the evidence. For example, in the largest consumer-facing magazine, People magazine, our product won an award for best canned coffee. The district court also was just calling balls and strikes on this evidence, saying it's insufficient. We put in the record $17.5 million worth of promotional spend to build this brand up. And the district court said, well, that's insufficient. You had no consumer survey. Their surveys are not needed. We have evidence of actual confusion here. We have said that they can be important, especially when they have their own survey showing that there's an under 1%. They certainly can be considered, but here we are on a motion for summary judgment. And so we're looking at whether a reasonable juror, considering all of this evidence, would find that there's a likelihood of confusion. You didn't have a trial because there was an award in People magazine and because millions of dollars have been spent? That doesn't say anything. No, it's not just that, Your Honor. We're looking at all of these factors. The district court agreed with us on most of the factors, most of the other factors. Okay, but the district court thought that the most important factor, and there is support for this, is the idea that the word rise is a commonly used concept used to refer to getting up in the morning and having a cup of coffee and so on. So that is a kind of weakness. So the acquired meaning would have to be pretty strong. So the district court thinks, okay, you spent a lot of money. You got some awards. There are some employees in the beverage industry who associate the word rise with the coffee product. But I don't think that that overcomes – I don't think a reasonable jury can conclude that that overcomes the commonality of this kind of mark. And so why do you think a reasonable jury could conclude that? There's more on this acquired meaning. Just walk me through what a reasonable juror would say, accepting the idea that rise is a commonly used concept for describing a morning cup of coffee. What is the evidence that the juror would say, okay, well, this overcomes all that? So I'll walk you through the acquired strength evidence. Well, I don't want to walk through the pieces of evidence. What's the logic of it? Well, there's this Rise Brewing Company. They won an award from People Magazine. And so therefore I can conclude that even though a lot of people would understand the word rise just to refer to coffee drinks generally, in the minds of the average consumer, they think about this particular product. So the average consumer would say, okay, first off, we have evidence of actual confusion here. That's strong, important evidence. Then the ordinary consumer would say, all right, how has Rise built this brand up? They've spent money on advertising. This is all on the record. They have partnerships with high-profile sports organizations, $20 million in revenue. They have won awards. And then this, I think, is maybe one of the key facts that was not before the first panel. When Pepsi's lead designer, okay, he gets a message from his boss, someone who was involved in potentially acquiring Rise, a message. And he says, oh, Rise is already used by a designer. He immediately associates. So I understand that that's something because somebody associates the word rise with this other brand. But if the ultimate inquiry is about consumer confusion, like, isn't a specialist in the industry less probative of whether the average consumer is going to be confused than actual consumers? So on a motion for summary judgment, though, we can't be calling balls and strikes about – Well, there is such a thing as the evidence being insufficient. Yes, but that's not the case here. Sure, that's not the case here, though. Okay, fine. Can I ask another question about the Hanna Financial thing?  You say that Hanna Financial clearly says that the likelihood of confusion is a question of fact. So in Hanna Financial, the court doesn't even say that the tacking determination is a question of fact, right? The Supreme Court says petitioner observes that the legal equivalence test, which is the tacking determination, involves the application of a legal standard. True enough, but the application of legal standards of fact to a question commonly called a mixed question of law and facts has typically been resolved by jury. So then it goes on to talk about the mixed analysis. Isn't that exactly the way we treat the likelihood of consumer confusion? So here the district court didn't say that it would never submit the likelihood of confusion question to a jury. It just said in this case there isn't enough evidence for a reasonable jury to make the predicate findings that would meet the standard of likelihood of confusion. And there's nothing in Hanna Financial that says you can't apply summary judgment. In fact, it's limited by saying as long as there's enough evidence to survive summary judgment, it should go to the jury. That's how the district court was going to treat the likelihood of confusion determination too, right? We don't know. I mean, the district court didn't have before the likelihood of confusion test that it was supposed to decide as a question of fact. It was guided by all of these prior panels going back to PLUS Products saying that it's a question of law. So we don't know what the district court would have said, but we do know— Well, it is a question of law. I mean, we treat it as a question of law, but I'm saying it's a legal standard and there's a lot of predicate facts that go into it. I mean, that's what jury questions are. Like, you give a jury instruction about what the standard is and you explain to the jury what factual findings they need to make in order to reach that conclusion, right? And, like, that would have been submitted to the jury if the district court thought that you had enough facts to create a question of fact. I agree, Your Honor, that it goes to—on a motion for summary judgment, it's the duty of the court to look and see are there enough facts in the record. I think it's clear in this— In the case of, like, a category error, you just disagree with the balancing. You just think the district court made a mistake by saying there isn't enough evidence to create a question of material fact, and we think there is. But I think that because this was treated as a question of law, the district court—you know, the district court, when it's analyzing this balancing, okay, and it's giving different presumptions as it should on summary judgment, because it treated it as a question of law, it didn't balance things correctly. If it was just a question of fact, it would have been looking at, okay, are there facts in the record? I think we understand that position. All right. You have three minutes for rebuttal. We'll hear from Ms. Sindali. Ms. Sindali. Good morning. Gail Sindali, counsel for PepsiCo. There are two striking things about my friend's argument. One is that the questions presented were all about arguing that strength of mark and likelihood of confusion should be contrary to the established law of the circuit, should be questions of fact, not questions of law. And we've heard very little about that, and I think for good reason. They realize that those are not availing. The second striking thing about this case is that nothing has really changed since the Rise and Shine II decision. As the district court said, you decided summary judgment on a substantially similar factual record. This is just the kind of case that lends itself for summary judgment. You said they have evidence of actual confusion, so do you want to address that? Sure. There are evidence of, well, first off, the court credited and let them win, though weakly, the actual confusion factor. So to some degree, they already, the court baked into its decision, noting that the issues with regard to strength of the mark and similarity are most important. But in any case, they're wrong with regard to their arguments on actual confusion because there are 19 anecdotes. When you put them in buckets, they're either non-consumers, industry people. They're questions, which Nora Beverages says, asking about, hey, are you connected with so-and-so? Tiffany and Nora Beverages say that's not confusion as a matter of law, and it's more de minimis, more like – It's not confusion as a matter of law. I mean if you have evidence of somebody calling up and saying, oh, you're using the mark rise, are you associated with this other rise? I mean why is – I mean that's some degree of confusion. Maybe it's weaker than somebody who assumes that you must be associated, but isn't it some indication of confusion? If you were – if this were a dilution case, that would be evidence of association but not of confusion, and that's what Tiffany and Nora Beverages – So the idea is because the question doesn't assume that there must be a connection, it's not actual confusion. That's right. No one is buying the wrong thing because trademark law is really designed to protect consumers, and that's why – Well, I don't know. If they have evidence of people who have some connection to the company that can make a direct inquiry to the company, maybe they're not confused because they can clarify it. But doesn't that suggest that the average consumer might be confused about whether the product was associated with the other manufacturer? No, because they could have had direct testimonials from consumers as opposed to similar to Jack Pocket and other cases, not – they have instead interested opinions of their own people recounting what someone said at the gas station. But more than that, Your Honor, you asked about actual confusion. The key significance here is we had six surveys. That is one thing that has changed from the preliminary injunction record. We had six surveys testing six ways to Sunday why there's no confusion here, and they had zero, not a single survey. So there is law, and we also had, as Judge Bianco mentioned, a survey showing a lack of secondary meaning on acquired distinctiveness. They had a zero survey, and the law of this circuit is where you had the opportunity and the means to be able to do a survey, and you didn't do it. That should be held against you. The other point is as long as we're talking about – Well, it's not as strong as it should be. But if we send it back to the district court and the district court does a fuller analysis on a fuller record and it actually finds that the actual confusion factor favors them, doesn't the question of if you think the mark is inherently weak but there's evidence of actual confusion that points in the direction of infringement, doesn't that seem like the kind of thing that should go to a jury because those are the two key things, right? No, Your Honor, because one, the court found no reasonable juror could come to this conclusion, and the other point is that simply this court could affirm on any reason in the record, and one of those reasons is the lack of similarity between the marks in question, which is law the case, which was decided at length. The previous panel, Rise and Shine II, found it was clear error for the district court to have found that these widely different looking cans of different sizes, different colors, different iconography, the wonderful lion, the shards, the kind of cool coffee kind of thing, you know, the court said that is not as a matter of law. But you wouldn't disagree that if, in fact, they had acquired such a secondary meaning that just every consumer would understand when you heard the word rise, they'd say, oh, the coffee drink. It wouldn't matter if the marks aren't similar if, in fact, the word rise is so associated with one brand. Well, two points. I disagree, Your Honor, because the Gentine Ice case, the Nabisco case, and the Playtex case in this court, both are Gentine Ice. You know, that's another big brand. A lot of people would know those brands, right? Those are big brands for gum, and the court said as a matter of law, if the words or if the presentation is so different, that would dispel confusion, and that's particularly true. Well, it could dispel confusion, right? But, like, let's say they had a survey. You fault them for not having a survey. Let's say there were a survey that showed 95% of consumers, when they hear the word rise, they think it must be from the Rise Brewing Company. Well, that would be a different – And that would be a pretty strong case, right? Even if, you know, really the only similarity between the marks was a large, bold-faced use of the word rise. You're right, Your Honor. If you had a situation where there was lots of other facts that would show that, despite the fact that the marks in question are presented in a very different way, that could indicate that people are still being confused, but that's not present here. And the other thing that my friend didn't say, and they didn't say in their opening brief, but I think is so important to this case because it was mentioned in Rise and Shine, too, is the fact that they themselves, in arguing that they should get a registration for the PTO, and then later, when confronted with a cease and desist letter from someone who used Rise for coffee, not just for flavored energy drinks, they said, oh, it's a crowded field. All the marks are weak. We should be allowed to coexist. So what I'm trying to say, if ever there was a case where summary judgment is proper, it's this case because there's really no dispute on the facts. There's no dispute over what the sales were, everything you heard about the $17 million, even the People magazine thing, that was all before the district court. All that was there and was unchanged from the district. So you don't dispute that there are those anecdotes about confusion. You just don't think it could overcome the inherent weakness of the mark. So the question is about the balancing. That's right. But it seems like you do disagree with this idea about whether industry specialists, like people who work for PepsiCo or whatever, would associate the mark. I mean they seem to suggest that that's even stronger evidence of confusion because they have more knowledge of the industry, but you, I think, suggest that's weaker evidence because those people don't look like average consumers. That's a dispute about how we should understand certain facts, right? But that's the point. It's a legal dispute. No one is debating as to what happened, what the sales were, what the ads were. All that's there. And so the question is what's the legal significance of that? And that's a question of law, and that's why Pepsi's – And it's a question of law in light of the other factors. So you're not just relying on the inherent weakness that Judge Manasci's panel found the first time. You're relying on the fact that there was no facial – that concluded also the lack of facial similarity, and also the district court found insufficient evidence of acquired meaning. All those things together would allow the determination to be made on the balance. And your own surveys that show no connection, and they have 17 anecdotes of confusion that the district court analyzed, most of which were industry insiders that said nothing about what the consumers were thinking. And that's the balancing right there. That's exactly right. Our point is that the questions presented on this question of law, question of fact, are wrong. You know, your description of Hanna, Your Honor, is exactly correct. Hanna doesn't change anything, and Carfreshner said it doesn't change anything. So they're wrong on this question of law, question of fact. But as Judge Bianco said, it doesn't really matter at the end of the day. It doesn't move the needle. The judge – Well, Carfreshner actually does say that it might make a difference, right? So like that footnote in Carfreshner says, in Hanna Financial, the Supreme Court said that tacking was a question of fact, and that calls into question our treatment of likelihood of confusion as a question of fact. I'm kind of puzzled by that footnote because as I read Hanna Financial, it does not conclude that tacking is a question of fact, right? So do you agree with me or with the footnote in Carfreshner? Well, I believe I agree with both because I think the – no, the reason, because the footnote in Carfreshner I think was saying, hey, here's this argument. I'm acknowledging this argument. We don't think it changes anything. But if you actually looked at it as the trademark lawyer, Hanna Financial, I can tell you with all the ink spilled on amicus briefs in that case, the whole point was how you – the circuits had split on how to assess tacking. Tacking is not about likelihood of confusion. It's not about all the complicated polaroid factors that this circuit created, but was about if you have, you know, the Pillsbury Doughboy and you make him look a little more modern next year or the year after that, can you go to the first priority date? So that is inherently something that is just, well, what does it look like to people? But the key thing – But if it's inherently because there is an ultimate legal standard as to whether the tacking is legally defensible, but the court says it's a mixed question of law and fact insofar as petitioner is concerned that a jury may improperly apply the relevant legal standard, the solution is to craft careful jury instructions to make that standard clear. So it does seem like it is an overall legal standard with a bunch of factual predicates, and that's the kind of thing we do submit to juries. Do we treat the likelihood of confusion any different than that? Like if there is a factual dispute that's relevant to whether the standard applies, we do the same thing, right? Like if they had enough evidence to survive a summary judgment, it would have been submitted to a jury just the way Hanna Financial does. Yes, if there was a true factual dispute, of course that would go to the jury. And as Your Honor noted, in Hanna Financial, the court said in big letters in the very same paragraph that my friends cite is that if summary judgment isn't granted. So even in Hanna, the court was recognizing you could have summary judgment. So your position is there really is no tension between our case law and Hanna Financial? Correct. Absolutely. And also the question of likelihood of confusion has to ultimately be a legal standard, right? Because the two elements of trademark infringement are that it's a protected mark and that there's a likelihood of confusion, right? Correct. And the first one is just an obvious inquiry as to whether they have protection. If the second one were a fact question, then the whole idea of trademark infringement would be a fact question, right? Well, effectively their argument, and I don't want to make a proves too much kind of argument, but it's like when would you have summary judgment but for this case? And do you want to try all trademark cases? We'll have a very busy court, and I don't think that makes sense. And I realize that I may be going over my time. I'm happy to answer any of their questions, but I just wanted to close with one point, and that is to hearken back to the really powerful and eloquently written policy considerations about giving overbroad protection to suggestive marks that resonated so much in Rise and Shine II, the idea that what they're really trying to do is get exclusive rights to a term that a lot of people use that makes sense. I mean I had a Starbucks before coming into the court today because I wanted to get a little energy and rise up and all that. You did. A lot of people use it, but they do say that they now have record evidence that actually not a lot of people use it because in this particular market, really only people thought about Rise Brewing Company. Is that a different factual record than we looked at on the PI? That is a mangling that they made of the record because what they did is they asked the experts taking a deposition, did you know of somebody else other than this? And what they didn't tell you is people were also usually asked, had you ever heard of Rise before you were hired in this case? No. And that's why, again, what's relevant is what is their proof of acquired distinctiveness. They had the chance. The district court, as Judge Bianco detailed, gave them the chance. She didn't say she was bound by Rise II on acquired distinctiveness. She says, I'm not bound, but I find it persuasive in part because nothing has changed. And then she marshaled the evidence. Thank you, Your Honor. Mr. McCullough, you have three minutes to rebuttal. Just to address that last point, the record evidence is that there were depositions of nine Pepsi employees and they were asked, do you know of any other brands that are on the market that use the word Rise other than the Mountain Dew Rise and Rise Brewing? And they said, no, those are the only two I know. Okay. So that's to be clear. We're also, you know, we were accused of running away from the legal issues. We address in the case law in our brief on page 24 and 25 that this circuit has long held that the strength of Mark is a question of fact. And it's only in more recent cases looking at it started with this Patsy's Pizza case. The initial classification of the Mark is a fact question, right? No, it was broader than that. So if you look at the Star Industries v. Bacardi case and all the other cases we cite in our brief, they say that each of the factors in the likelihood of confusion test is reviewed for clear error. They were all questions of fact. It's only very recently where some courts have said it's a mixed question of fact and law. So you're saying it's not even a mixed question of fact and law? I'm saying the district court believed that it was a pure question of law. I'm asking about your position. You think it's a pure fact question? That's what the precedent in this circuit has. Two elements of trademark infringement are whether the Mark is protected and whether there's a likelihood of confusion. They're both fact questions because whether it's protected, you can just look at the registry, right? And so if the second thing is a fact question, doesn't that mean that the enforcement of the trademark laws is just all a fact question? There's got to be a legal standard in there somewhere, right, that we're applying. Well, certainly summary judgment can apply in any of these cases. But it is a fact question, and more of these cases should be going to a jury unless there's just no evidence on likelihood of confusion or very, very minimal evidence. Here we have lots of evidence of acquired distinctiveness. We have copies. The prior panel in this case already rejected this idea that the strength of the Mark is a fact question. They already rejected that. They cited a case from Patsy's brand from 2003 which said the same thing, that there's a component of strength of the Mark that is legal. So I don't understand why we're having this discussion. So even if there's a component of the question on strength of Mark that's legal, that also means there's a component of it that is factual. We have new facts in the record. And that Patsy's case cites nothing for this proposition that there's some legal component, and it was not an en banc decision of this court. And going back for decades before, every other panel of this court has held. You want this panel to overrule the prior panel in this very case on this issue. Is that what you're asking? I'm not asking you to overrule them. I think that there's a path here with acquired distinctiveness. That's a different argument. I tried to steer you that way, and I don't want to go through it again. But I agree with you that acquired distinctiveness is factual, and the district court looked at your additional facts and found that no rational jury could conclude in your favor on that factual issue. But the time is up. So your position is that our treatment of likelihood of confusion as ultimately the application of legal standard is wrong. We don't have the discretion to just overturn those prior cases. But in light of the understanding that it's wrong, we should understand the way a district court grants summary judgment differently to allow more things to go to the jury. Well, it's two points to be very clear. It's on strength of mark. That should be a question of fact, and that had been the panel precedent up until the Patsy's case. It's considered as a question of fact of law. You said you're not asking us to overrule those decisions. Are you asking us to overrule the decisions where we say? So on conceptual strength, even if the question is treated as a mixed question of fact and law, there are new facts in the record that the district court did not consider at all because she thought it was a pure question of law. Okay. Thank you. Okay. Thank you. We'll reserve the decision and have a good day. You can head to Starbucks again.